Memorandum of Decision
CT Page 145
On June 16, 1998, Carol A. Veroczi, attorney for the minor child, Alyssa, initiated the present action to terminate the parental rights of Lorie R. and Tony F.R., the acknowledged, unmarried parents of Alyssa R., a child born on August 18, 1993. The grounds alleged by the child's attorney are as follows:
(B) the parents of a child who has been found by the Superior Court to have been neglected or uncared for in a prior proceeding have failed to achieve such degree of personal rehabilitation as would encourage the belief that within a reasonable time, considering the age and needs of the child, such parents could assume a responsible position in the life of the child;
(C) the child has been denied, by reason of an act or acts of parental commission or omission, the care, guidance or control necessary for his physical, educational, moral or emotional well-being. Nonaccidental or inadequately explained serious physical injury to a child shall constitute prima facie evidence of acts of parental commission or omission sufficient for the termination of parental rights;
(D) there is no ongoing parent-child relationship, which means the relationship that ordinarily develops as a result of a parent having met on a day to day basis the physical, emotional, moral and educational needs of the child and to allow further time for the establishment or reestablishment of such parent-child relationship would be detrimental to the best interest of the child.
If the parent's rights are terminated, it is the intention of the Department of Children and Families (DCF) to allow the paternal grandmother to adopt the child. The father told the court appointed evaluator, Dr. Robert Meier, that ". . . he feels that his mother would be the best person to raise Alyssa, and the the child is close to her." It is odd, therefore, that the only person actively contesting the termination of the parental rights of the parents is the father. It is of even greater oddity, since the father is a sentenced and convicted felon for having abused Alyssa and a condition of his probation is that he have no contact with the child.
The record of the case reflects that the case was initially commenced on February 5, 1996 by a petition filed by the CT Page 146 Department of Children and Families alleging abuse and neglect of the child. The social study prepared for that proceeding and marked as a full exhibit in this proceeding (Exhibit # 8), reflects the following facts which were not directly challenged at either the earlier neglect/abuse determination or at the termination of parental rights trial. Alyssa's mother, Lorie, is presently thirty years of age; she has never been married. Alyssa lived with her mother from her birth in August, 1993, until July 13, 1995 when the mother, who expresses love for Alyssa "[a]lthough she reports being unable to care for the child emotionally and financially," placed the child with the child's father, Tony. Tony was then living with his fiancee, Tricia, and her two boys. The couple, Tony and Tricia, subsequently married on August 28, 1995. (Petitioner's Exhibit # 3)
Alyssa had lived with her father and step-mother and her two children of a prior relationship for approximately six months when, on February 1, 1996, the father's brother Victor, the child's uncle, spirited the child out of the apartment of Tony and Tricia, and summoned a police officer. Alyssa was brought by the police to the St. Francis Hospital where the examination of the child revealed multiple bruises on her forehead, cheeks, neck, right ear, upper and lower arms, legs, and buttocks, and abrasions about the eye. She had a laceration on her chin, some type of chemical or hot water burns on both feet, "longitudinal marks, that appear to have been made by an object such as a belt on her back," bilateral fingernail marks on her upper arms, and patchy abraded areas on her buttocks "which appear to have been made by an object, such as a brush." Photographs of the injuries to this young child were marked by agreement as Exhibits 1A through 1H. At the time she was examined by hospital staff, the child appeared with dirty hair and fingernails and a with a strong smell of urine to her. The physician at the hospital and the social worker concluded that the child appeared to have been extensively abused and to return her to the environment in which she was found, in the care of Tony and Tricia, would place the child in serious danger.
Victor, Alyssa's uncle, gave a statement to the police on February 1, 1996 (Petitioner's Exhibit # 2), in which he indicates that on that date he went to Tony and Tricia's to pick Tricia up for a job interview at about 5:20 p. m. Tricia and her two children Quincey and Matthew, went to the town of Vernon for Tricia's job interview. While Tricia was in for an interview, Victor asked Matthew where Alyssa was, to which he replied that CT Page 147 she was locked in a bathroom back at the apartment. After the job interview the four of them went out to McDonald's for dinner. When they later returned to the apartment, Victor made an excuse to leave the room and check the bathroom. The door was locked. Victor picked the lock and found Alyssa, aged two and a half, in the dark bathroom sitting on the drain in the shower, naked. There was a bowl on the floor with something in it, and "the room smelled like a dog was living there." Victor picked up the child, wrapped her in a skirt off the bed, ran out of the house and found a policeman.
The child's step-mother, Tricia, blamed Tony for putting the child in the bathroom in order to potty train her until she knew how to use the bathroom. Tricia denied providing care for Alyssa and indicted that the child's father, Tony, was responsible for her care and discipline. Notwithstanding the fact that Alyssa was found in a depraved and unattended state, suffering from numerous injuries and physical insults in varying states of healing, both the father and the step-mother denied abusing Alyssa and both denied leaving her unattended. On November 19, 1996, Tony filed a plea of nolo contendere to the charges of abuse and neglect. The court (Teller, J.) entered a finding that Alyssa had been neglected in accordance with the allegations of the petition.
On February 7, 1996, an arrest warrant was issued for the arrest of Tony for cruelty to persons in violation of General Statute § 53-20 and risk of injury to a minor child in violation of General Statute § 53-21. These charges were predicated upon the above described treatment of Alyssa. Unable to make bail, Tony remained in jail from February until August 29, 1996 when he was found guilty of the risk of injury charge, an unclassified felony. He was sentenced to five years in jail, execution suspended after the time he already served and he was placed on probation for three years. (Petitioner's Exhibit # 11) Among the many conditions of his probation, which is still in effect, he is not to have any contact with Alyssa. (Petitioner's Exhibit # 12) He has not had any authorized contact with the child since these events occurred nearly three years ago, except for a court ordered parent-child evaluation.
Seven months after Alyssa's removal from the house, the court ordered an evaluation by Dr. Robert Meier, a clinical psychologist. (Petitioner's Exhibit # 3) The psychologist found the interaction between father and daughter to be strained and distant. The child made several statements to the foster mother CT Page 148 about Tony hurting her. The evaluator concluded that there was no clear indication of any bond between them and little interaction was initiated by either of them. In a report prepared in November, 1998, Dr. Meier concluded that Alyssa appeared to be most closely bonded to the paternal grandmother, and in many respects, she views the paternal grandmother's home as her own. Dr. Meier noted that "it is most likely that [Alyssa] would be most comfortable in that setting." Further, the paternal grandmother has a good relationship with the maternal grandmother and would allow regular contact with the extended family.
The foregoing facts are contained in the documentary evidence, Exhibits 1-12. The court found as a threshold matter at the commencement of the trial that after thoroughly reviewing the evidence in camera,[2] which had been marked and admitted prior to the institution of the trial, that the petitioner had satisfied her burden of going forward based entirely upon the records admitted in to evidence. The evidence included records of the police investigation, the records of conviction, the findings within the file as to the neglect adjudication, the social studies of the neglect petition and of the termination petition, the photographs showing the bathroom and the child's physical injuries, as well as various affidavits and signed statements. The court thereafter permitted the parties to call whomever they thought they needed and permitted the respondent to call any witnesses that he wished. The court further indicated to counsel that the respondent had the right to cross examine the authors of the social studies and the author of the psychological evaluation.[3] The respondent's brother, Victor, two social workers and Dr. Robert Meier testified. The respondent had the opportunity to cross examine the witnesses. Indeed, the trial was continued from December 7, 1998 until Wednesday, December 30, 1998, to allow for the respondent to call any witnesses and to permit the cross examination of Dr. Meier.
On that same date, December 30, 1998, the respondent moved for a mistrial which the court denied. The motion appears to be based upon the respondent's belief that the court may not consider and form an opinion based upon evidence properly placed before the court for it's consideration. The respondent cited no authorities for such a proposition.
The respondent's principal objection to the termination of his parental rights relates to the disposition of the case by termination of parental rights and subsequent adoption by the CT Page 149 father's mother rather than by simply transferring guardianship to her. This objection belies a failure of the respondent to understand the principles of a good permanency plan for children.
This issue of prolonged foster care has recently been addressed in a notice of proposed rule-making by the U.S. Department of Health and Human Services. In preparing the regulations to implement the Adoption and Safe Families Act of 1997, (Federal Register September 18, 1998), the Department indicated that "foster care is a temporary setting and not a place for children to grow up. " Neither foster care nor transfer of guardianship meet all the requirements of a good permanent plan for children in most cases. In situations where the children cannot be safely returned to their parents, adoption is the best alternative when it is available.
According to the proposed federal regulations, a good permanency plan must address the following questions:
1) Is the plan legally intended to be permanent both to last throughout the child's minority and to establish family relationships that will last the child's lifetime?
2) Is it legally secure from modification?
3) Is it binding on the adult or adults who are awarded permanent care and control of the child?
4) Does the permanent care giver have the equivalent responsibility for the child as a birth parent?
5) Does the government no longer act as the child's parent?
Neither foster care nor transfer of guardianship meet all these requirements. Termination of parental rights and subsequent adoption is the only plan that meets all of these criteria short of return of the child to the natural parent, where possible. In this case neither parent is an appropriate caretaker of Alyssa.
 ADJUDICATION
Based upon the clear and convincing documentary evidence and testimony received in this case the court finds the biological parents of Alyssa, a child who has been found by the Superior Court to have been neglected or uncared for in a prior CT Page 150 proceeding, have failed to achieve such degree of personal rehabilitation as would encourage the belief that within a reasonable time, considering the age and needs of the child, such parents could assume a responsible position in the life of the child. Further, the court finds that the child has been denied, by reason of an act or acts of paternal commission or omission, the care, guidance or control necessary for his physical, educational, moral or emotional well-being. The court also finds that there is no ongoing parent-child relationship between Alyssa and her biological parents, which means the relationship that ordinarily develops as a result of a parent having met on a day to day basis the physical, emotional, moral and educational needs of the child and to allow further time for the establishment or reestablishment of such parent-child relationship would be detrimental to the best interest of the child.
The court finds that these grounds have existed for more than one year. The court finds that reasonable efforts to reunify the parents with the child were not possible or appropriate given the natural mother's lack of interest and the natural father's abusive conduct, poor parental history and failure to protect the child.
 MANDATORY FINDINGS
With respect to the mandatory factual findings required by General Statutes § 17a-112(e), the court notes that most of these findings have been previously addressed in the earlier factual findings of the decision and will accordingly be summarily addressed:
1) The timeliness, nature and extent of services offered. The court finds that the father was prohibited from contact by order of the criminal proceedings and he was incarcerated for a period of time. The court finds that the mother was unwilling to participate in needed psychiatric/psychological evaluation and treatment and she specifically rejected DCF assistance.
2) Whether DCF has made reasonable efforts to reunite the family pursuant to the adoption assistant and child welfare act of 1980. This act has been largely superseded by the Adoption and Safe Families Act of 1997. Under the presently existing federal law reasonable efforts to reunite may be waived under certain aggravating circumstance such as those presented by the facts of this case. The permanency plan proposed is in accordance with CT Page 151 proposed federal regulations.
3) The terms of applicable orders entered into and agreed to by any individual or agency and the extent of fulfillment of those obligations, etc. The court finds that the mother did not fulfill or comply with any of the expectations and did not wish to participate in these proceedings. As a condition of probation the father is not to have any contact with the child.
4) The feelings and emotional ties of the child with respect to the parents and foster parents, etc. See infra, discussion of Dr. Meier's findings and permanency planning.
5) As to the age of the child. Alyssa is now five and one half years old.
6) The efforts the parent has made to adjust her circumstances or conditions. The court finds that the mother has not made any meaningful attempt to adjust her circumstances, conduct or condition to facilitate reunification. She does not have a plan for the return of the child to her care. The court is unable to assess the father's rehabilitative efforts since he has by his conduct and criminal prosecution placed himself in a position where he is not able to parent the child. His plan for the care of the child is to have his mother care for the child.
7) The court finds mat there has been nothing to prevent the mother from maintaining a meaningful relationship with her children. There was no unreasonable conduct noted by DCF who offered services. The court orders in the criminal proceedings prevented contact between father and child.
 ORDER
Based upon the foregoing findings, the court determines that it is in the child Alyssa's best interest for a termination of parental rights to enter with respect to the mother Lorie Ann R. and the male biological parent Tony F.R. and accordingly a termination of their parental rights is ordered. It is further ordered that the Commissioner of DCF is appointed statutory parent for the purpose of securing an adoptive family. The commissioner shall file with this court no later than ninety days following the date of judgment a written report of efforts to effect such permanent placement and file further reports as are required by State and federal law. CT Page 152
BY THE COURT
Foley, J.